U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

APR 24 2015

CLERK, U.S. DISTRICT COURT
By _____
           Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

HARTFORD CASUALTY INSURANCE §
COMPANY, ET AL., §
§
          Plaintiffs, §
§
VS. §   NO. 4:14-CV-452-A
§
DP ENGINEERING, LLC, ET AL., §
§
          Defendants. §

MEMORANDUM OPINION
and
ORDER

Before the court for consideration and decision is the
motion of plaintiffs, Hartford Casualty Insurance Company
("HCIC") and Hartford Lloyds Insurance Company, ("HLIC"), for
summary judgment.  After having considered such motion, the
response thereto of defendants, DP Engineering Ltd. Co.[1] ("DPE")
and John Scroggins ("Scroggins"), the summary judgment record,
and pertinent legal authorities, the court has concluded that
plaintiffs' motion should be granted.

---

[1] In the instant action as filed and in some of the underlying lawsuits and some of the insurance
policies, DPE is referred to as "DP Engineering LLC" and in some instances it is referred to as "DP
Engineering, Inc." or "DP Engineering Ltd."   The court is satisfied from the summary judgment record
that the legal name of DPE is "DP Engineering Ltd. Co." and that "DP Engineering LLC," "DP
Engineering Ltd.," and "DP Engineering, Inc." are assumed names that DP Engineering Ltd. Co. has used
from time to time, or that others have used from time to time to refer to DP Engineering Ltd. Co.
Whichever name has been used, it has reference to the same entity, legally known as "DP Engineering
Ltd. Co."

I.

## Nature of the Controversy Presented by the Motion

In March 2013 plaintiffs were providing liability insurance coverage to DPE as the named insured under three insurance policies--two primary insurance policies (one issued by HCIC and the other issued by HLIC) and an umbrella policy issued by HCIC. Each of the policies contained an exclusion that said that the policy did not apply to bodily injury or property damage arising out of the rendering of, or failure to render, any professional services by or for "any insured" (in two of the policies) or the "named insured" (in the third) ("professional services exclusions").

Entergy Operations, Inc. ("Entergy") operated a nuclear-powered energy plant in the State of Arkansas.  As part of maintenance of the plant, Entergy was required to refurbish a large component, known as the stator, of one of the plant's units, and as part of that process was required to cause the stator to be moved from one place to another in the plant facility (the "stator project").  DPE was an engineering company that contracted with Entergy to provide Entergy consulting, professional, or other technical work as requested by Entergy. Pursuant to its contract with Entergy, DPE undertook certain work

2

related to the stator project.  Scroggins was a DPE employee assigned by DPE to perform work related to the stator project.

The movement of the stator was accomplished by using a temporary gantry (crane and trolley) structure, referred to by the parties as the "gantry."  On March 31, 2013, as the gantry was holding the stator in the process of the move, the gantry failed, allowing the stator, which weighed approximately 550 tons, to fall, causing significant damage to Entergy's property, the death of a contract worker, and injuries to other contract workers.

The property damage, death, and injuries resulting from the fall of the stator led to the filing of five lawsuits (the "underlying lawsuits") in the Circuit Court of Polk County, Arkansas.  One was by Entergy and a related entity, Entergy Arkansas, Inc., against DPE, Scroggins, and other entities involved in the stator project seeking recovery of damages suffered by Entergy and the related entity by reason of the stator accident ("Entergy lawsuit").  Another was brought by the personal representative of the estate of the worker who died as a result of injuries suffered because of the stator accident against Entergy, DPE, and others, seeking recovery of damage to which the deceased worker's estate and survivors might be entitled by reason of the worker's death ("Allen lawsuit").  Each

of the other three lawsuits was brought by a worker injured as a result of the stator accident against Entergy, DPE, and others, seeking personal injury damages ("personal injury lawsuits").

Plaintiffs are seeking by their complaint for declaratory judgment in this action a declaration that by reason of the professional services exclusions in the insurance policies, neither of the plaintiffs has any obligation to provide a defense to DPE or Scroggins as to the claims asserted against them in the underlying lawsuits or to provide any indemnification to DPE or Scroggins for any of the claims asserted against them in the underlying lawsuits.  DPE and Scroggins filed counterclaims seeking declarations that HCIC and HLIC each has a duty to defend them, or at least to participate in their defense, in the underlying lawsuits.

By the motion for summary judgment, plaintiffs seek an adjudication that the professional services exclusions in the insurance policies cause neither plaintiff to have an obligation to defend DPE or Scroggins in the underlying lawsuits or to provide any indemnification to them as to the claims made in those lawsuits.  DPE and Scroggins have responded that an adjudication as to any indemnification obligation on the part of plaintiffs should be denied because, if for no other reason, such a request at this time is premature, and that an adjudication that plaintiffs do not have an obligation to defend them in the

underlying lawsuits would be inappropriate because of uncertainty as to whether the theories of recovery being alleged, or that might be established, against DPE or Scroggins in the underlying lawsuits all are, or will be, within the scope of the professional services exclusions.

II.

The Professional Services Exclusions

A.   The Wording of the Exclusions

Plaintiffs seem to concede, at least for the purposes of their motion, that the three insurance policies in question would obligate plaintiffs to provide a defense to DPE and Scroggins as to the claims asserted against them in the underlying lawsuits if the professional services exclusions were not in the policies, and that indemnification of DPE and Scroggins for liability imposed upon them by reason of those claims would be required by the policies were it not for those exclusions.  Doc. 36 at 4-5, ¶ 6.[2]  The court, therefore, is proceeding on the assumption that the only policy provisions that are pertinent to the summary judgment motion are the professional services exclusions.

The primary insurance policy issued by HCIC to DPE was Policy No. 46 SBA VE6509 SC, with a policy period from

---

[2]The "Doc. ___" references are to numbers assigned on the clerk's docket to items that have been filed in the above-captioned action.

5

September 25, 2012 to September 25, 2013.  That policy contained

an exclusion worded as follows:

> This insurance does not apply to "bodily injury,"
> "property damage," . . . arising out of the rendering
> or failure to render any professional services by or
> for you, including:
>
> > 1.   The preparing, approving, or failing to
> >      prepare or approve maps, drawings, opinions,
> >      reports, surveys, change orders, designs or
> >      specifications; and
> >
> > 2.   Supervisory, inspection or engineering
> >      services.

Doc. 37 at 49.  The word "you" in the endorsement referred to

DPE.  Id. at 8, 20.

The primary policy issued by HLIC to DPE was Policy No.

46 SBA IE5034 SC, with a policy period from September 25, 2012 to

September 25, 2013.  That policy contained an exclusion worded as

follows:

> 1.   The following exclusion is added to Paragraph 1.,
>      Applicable to Business Liability Coverage (SECTION B. -
>      EXCLUSIONS):
>
> > This insurance does not apply to "bodily injury,"
> > "property damage," . . . arising out of the
> > rendering of or failure to render any professional
> > services by:
> >
> > > a.   Any insured; or
> > >
> > > b.   Any engineering, architectural or
> > >      surveying firm that is performing work
> > >      on your behalf in such capacity.

6

    2.    Professional services include:

        a.    The preparing, approving, or failure to prepare or approve, maps, shop drawings, opinions, reports, surveys, field orders, change orders, designs or drawings and specifications; and

        b.    Supervisory, inspection architectural or engineering activities.

Doc. 37 at 98.  DPE was an "insured" as that word is used in the endorsement, id. at 60, 81, as was Scroggins, id. at 81.

The umbrella policy issued by HCIC to DPE was Policy No. 46 XHU XU5090 SC, with a policy period from September 25, 2012 to September 25, 2013.  It contained an exclusion worded as follows:

This policy does not apply to "bodily injury", "property damage" . . . arising out of the rendering of or failure to render any professional services described in the Schedule of this endorsement.

Id. at 131.  That exclusion said "See IH 1201" for a "Description of Professional Services."  Id.  The "IH 1201" page of the policy designates professional services as "Engineering Services."  Id. at 133.  The umbrella policy also contained an "Engineers, Architects or Surveyors Professional Liability" exclusionary endorsement, which provides, in pertinent part, as follows:

This policy does not apply to:

'bodily injury';

"property damage"; . . .

. . .

7

> Arising out of the rendering of or failure to render
> any professional services by or for any "insured,"
>
> including:
>
> 1.   The preparing, approving, or failing to prepare or
>      approve maps, drawings, opinions, reports,
>      surveys, change orders, designs, or
>      specifications; and
>
> 2.   Supervisory, inspection, or engineering services.

Doc. 37 at 130.  DPE was an "insured" in the umbrella policy, id.

at 108, 112, 118, as was Scroggins, id. at 118.

B.   Court Interpretations and Applications of Similar Exclusions

     The exclusion with which the Texas appellate court was

concerned in Maryland Casualty Co. v. Crazy Water Co. excluded

from the insurance coverage "claims due to the rendering of any

professional services or the omission thereof, by the assured or

employees of the assured."  160 S.W.2d 102, 103 (Tex. Civ. App.--

Eastland 1942, no writ).  The court included in its discussion of

the meaning of the word "professional" as used in the exclusion

the following:

>      The meaning of the word "profession" in the sense
> that "professional" is "that which pertains to a
> profession" . . . may, perhaps, be best understood by
> mention of some prominent or characteristic elements,
> rather than by an attempted complete definition.  It
> serves no useful purpose in the present inquiry to say,
> as truly may be said, that a profession is a vocation,
> calling, occupation or employment.  In some sense, of
> course, a profession involves labor, skill, education,
> special knowledge and compensation or profit.  The
> labor, as well as the skill, however, involved is

> predominantly mental or intellectual, rather than
> physical or manual.  The education or special knowledge
> involved is characterized by its use for others as
> distinguished from self, or as sometimes said "a
> practical dealing with affairs as distinguished from
> mere study or investigation."

Id. at 104-05 (citation omitted).  The court also explained that

"[w]e may be sure in any case that the words 'rendering

professional services' refer to services pertaining to some

profession rendered by one in the pursuit of such profession," as

distinguished from "menial services, or the services of a common

laborer."  Id. at 104.  The court added that to ascertain the

meaning of the words as applied to the particular case, "it is

necessary . . . to consider the nature of [the insured's]

vocation as well as all provisions of the policy of insurance in

which the words occur."  Id.

The exclusion with which the Texas appellate court dealt in

Atlantic Lloyd's Insurance Co. of Texas v. Susman Godfrey,

L.L.P., excluded insurance coverage for any bodily injury or

property damage due to the rendering or failure to render any

professional service.  982 S.W.2d 472, 476 (Tex. App.--Dallas

1998, pet. denied).  The court explained that:

> [I]t is clear that a professional must perform more
> than an ordinary task to perform a professional
> service.  To qualify as a professional service, the
> task must arise out of acts particular to the
> individual's specialized vocation.  We do not deem an
> act a professional service merely because it is

performed by a professional.  Rather, it must be
necessary for the professional to use his specialized
knowledge or training.

Id. at 476-77.

The exclusion before the Fifth Circuit in <u>Guaranty National</u>

<u>Insurance Co. v. North River Insurance Co.</u> excluded coverage for

bodily injury that occurred "due to . . . the rendering of or

failure to render . . . any service or treatment conducive to

health or of a professional nature. . . ."  909 F.2d 133, 135

(5th Cir. 1990).  The Fifth Circuit interpreted the exclusion "to

avoid coverage only for actions taken on behalf of a patient that

are based on professional, medical judgment."  <u>Id.</u>  It followed

from that interpretation, according to the Fifth Circuit, that

the exclusion did not apply to a bodily injury that resulted from

the insured's negligent failure to maintain a patient's window

"in such a manner as to prevent her from committing suicide

through the window," <u>id.</u> at 135-36, explaining that "[t]he

hospital's error was not that it decided as a matter of

professional judgment not to protect the open unit patients from

the perils posed by the windows," but, "[i]nstead, the error was

that once the hospital decided to provide such protection, it did

not do so adequately."  <u>Id.</u> at 136.

A conclusion similar in principle to the one reached by the

Fifth Circuit in <u>Guaranty National</u> was reached in <u>National</u>

<u>Casualty Co. v. Western World Insurance Co.</u>, in which the Fifth
Circuit held that "decisions relating to the dispatching of EMTs
to an accident scene, like the decision of the hospital in
<u>Guaranty National</u> to secure patients with screws instead of a
screen, are 'administrative' and consequently not covered by
professional services exclusions."  669 F.3d 608, 615 (5th Cir.
2012).  And, a similar outcome was reached in <u>Potomac Insurance
Co. of Illinois v. Jayhawk Medical Acceptance Corp.</u> in which the
Fifth Circuit held that a professional services exclusion did not
exclude a claim against a medical acceptance corporation based on
an alleged negligent referral to a physician "[b]ecause mere
referrals are administrative, or ministerial tasks that do not
fall within the exclusion for 'professional services'. . . ."
198 F.3d 548, 551 (5th Cir. 2000).

     In <u>Utica National Insurance Co. of Texas v. American
Indemnity Co.</u>, the Texas Supreme Court was called upon to
interpret the scope of a professional services exclusion in a
general liability insurance policy issued to a doctors'
association.  141 S.W.3d 198, 199 (Tex. 2004).  Patients who had
been injured by the administration of contaminated anesthetics
filed a claim against the association; and, its insurer relied on
a policy exclusion for any "[b]odily injury . . . due to
rendering or failure to render any professional service."  <u>Id.</u> at

11

199.   In the course of rejecting the insurer's contention, the

Court stated:

> We conclude that the policy excludes coverage only when
> the insured has breached the standard of care in
> rendering those professional services.  In this case,
> the allegations in the pleadings raised both the
> possibility that the treating doctors were negligent in
> their administration of the drug and the possibility
> that the doctors' association was negligent in the
> storage of that drug.

Id. at 200.   The Court attached special significance to the use

of the words "due to," rather than "arising out of," in the

exclusion, id. at 202-203, holding that "[t]he most reasonable

conclusion is that 'due to' requires a more direct type of

causation that could tie the insured's liability to the manner in

which the services were performed," id. at 203.   The Court

provided an informative discussion of the proper effect to give

to an exclusionary clause containing the "arise out of" language,

saying:

> This Court has held that "arise out of" means that
> there is simply a "causal connection or relation," Mid-
> Century Insurance Co., 997 S.W.2d at 156 (Tex. 1999),
> which is interpreted to mean that there is but for
> causation, though not necessarily direct or proximate
> causation.   See McCarthy Bros. Co. v. Cont'l Lloyds
> Ins. Co., 7 S.W.3d 725, 730 (Tex. App.--Austin 1999, no
> pet.); see also Admiral Ins. Co. v. Trident NGL, Inc.,
> 988 S.W.2d 451, 454 (Tex. App.--Houston [1st Dist.]
> 1999, pet. denied).   Other jurisdictions also
> interpret "arising out of" to exclude a proximate cause
> requirement.   See McCarthy Bros., 7 S.W.3d at 729-30;
> see also 1 Rowland H. Long, The Law Of Liability
> Insurance § 1.24 (1991) ("The phrase 'arising out of'

12

is not equivalent to 'proximately caused by.' . . .
'"But for" causation, <u>i.e.</u>, a cause and result
relationship, is enough to satisfy the provision of the
policy.'") (quoting <u>Mfrs. Cas. Ins. Co. v. Goodville
Cas. Co.</u>, 403 Pa. 603, 170 A.2d 471 (1961)).  Likewise,
the United States Court of Appeals for the Fifth
Circuit has concluded that "'[a]rising out of' are
words of much broader significance than 'caused by.'"
<u>Red Ball Motor Freight, Inc. v. Employers Mut. Liab.
Ins. Co.</u>, 189 F.2d 374, 378 (5th Cir. 1951); <u>see also</u>
<u>Am. States Ins. Co. v. Bailey</u>, 133 F.3d 363, 370 (5th
Cir. 1998).

<u>Id.</u> at 203.

<u>Utica Lloyds of Texas v. Sitech Engineering Corp.</u> involved a

professional services exclusion comparable to those in

plaintiffs' policies, reading as follows:

> This insurance does not apply to "bodily injury,"
> "property damage," "personal injury" or "advertising
> injury" arising out of the rendering or failure to
> render any professional services by or for you,
> including:
>
> 1.    The preparing, approving, or failing to prepare or
>       approve maps, drawings, opinions, reports,
>       surveys, change orders, designs or specifications;
>       and
>
> 2.    Supervisory, inspection or engineering services.

38 S.W.3d 260, 263 (Tex. App.--Texarkana 2001, no pet.).  The

appellate court rejected a contention that the wording of the

exclusion was ambiguous, explaining that:

> Provisions of an insurance policy are construed by the
> rules applicable to the construction of contracts. . .
> .  A contract or insurance policy provision is
> ambiguous only where the terms are susceptible to
> differing reasonable interpretations. . . .   The fact

13

that the parties interpret the contract in different
ways does not mean that the contract is ambiguous.  The
words in an insurance policy are given their ordinary
meaning unless the policy clearly gives them a
different meaning. . . .  Where the policy terms are
unambiguous, the language of the policy alone expresses
the parties' intent, and it must be enforced as
written.

Id. at 263-64 (citations omitted).  The court found that the

policy exclusion was "clear and unambiguous," and extended to

conduct that constituted professional services that allegedly

were done negligently.  Id. at 264.  If the services the insured

was alleged to have negligently performed were professional

services within the definition of that term in the policy, the

claim arising from the performance of those services was excluded

from the coverage of the policy.  Id.

III.

Pertinent Allegations in the Underlying Lawsuits

A.   Role in the Stator Project Attributed to DPE and Scroggins
     in the Underlying Lawsuits

     1.   Entergy Lawsuit

     The Entergy lawsuit was filed July 12, 2013, as Case No.

CV2013-176.  Entergy explained DPE's presence as a defendant in

the lawsuit by saying that Entergy contracted with DPE for

certain work related to the stator project, Doc. 37 at 137, ¶ 18,

and explained Scroggins' presence as a defendant by alleging that

he was the DPE employee assigned by DPE to perform work related

14

to the project, id., ¶ 19.  Entergy alleged that DPE and other
defendants named in the action were involved in a decision not to
perform a load test on the gantry being used in the stator
project, deciding instead to rely on inaccurate representations
that the gantry previously had been used in the same
configuration to lift equipment that exceeded the anticipated
weight of the stator, id. at 138, ¶ 27, and that DPE and other
defendants knew, or should have known, that those representations
were false and inaccurate, id. at 139, ¶ 29.  Also, Entergy
alleged that DPE and another defendant had concerns, or knew of
concerns, about not anchoring the gantry to the turbine building,
but failed to act on those concerns.  Id. at 140, ¶ 33.

Attached to the Entergy complaint was a copy of its
agreement with DPE, which was titled "Entergy Operations, Inc.
Engineer of Choice Agreement (Professional General Services
Agreement)."  Id. at 152.  The scope of the agreement was stated
as follows:

> The purpose of this Agreement is to set forth the
> terms and conditions under which [DPE] will provide to
> Entergy Operations consulting, professional or other
> technical Work as described in Contractor Orders
> executed in accordance with the procedures set forth in
> Article 4 and Exhibit F. . . .

15

Doc. 37 at 157, ¶ 3.  With respect to personnel to be used by DPE

in its performance under the agreement, the agreement provided

that:

> A.   In consideration for the relationship established
> by this Agreement, [DPE] shall provide the most
> qualified, skilled, and productive personnel for the
> Work.  [DPE] shall hire, supervise and train personnel
> consistent with, or exceeding applicable professional
> standards.

Id. at 189, sec IX. A.  The agreement described the scope of

services to be provided by DPE under the agreement as follows:

> A.   Services to be performed by [DPE] shall include,
> but are not limited to Civil, Mechanical, Electrical,
> Structural, Nuclear, Architectural, and other
> engineering and professional services required to
> complete all scope requirements in accordance with
> Contract Orders and the requirements of this Agreement.
>
> B.   Specific design engineering activities to be
> performed by [DPE] shall include, but are not limited
> to modifications, analysis and supporting calculations,
> specifications, project scoping studies, project
> management, modification work plans, field follow,
> modifications closeout, programs support, owner
> reviews, and other engineering and professional service
> required to complete all scope requirements in
> accordance with Contract Orders and the requirements of
> this Agreement.
>
> C.   [DPE] shall establish and maintain dedicated team
> of qualified resources, maintain a site engineering
> team as required to support projects, function as an
> extension of Entergy Operations design engineering,
> perform project work, provide preferred engineering
> services to Entergy Operations, and support emergent
> work requests as a priority at Sites where [DPE]
> performs Work.  Unless noted otherwise, [DPE] shall
> perform the roles and responsibilities of the

       Responsible Engineer as delineated in Entergy
       Operations procedures for design related activities.

Doc. 37 at 186, §§ II. A., B., and C.

    On February 4, 2015, Entergy filed an amended complaint in the Entergy lawsuit in which the allegations directed against DPE and Scroggins were basically the same as those contained in the original complaint filed July 12, 2013.  Id. at 212, 234.

    2.  Allen Lawsuit[3]

    The Allen lawsuit, which was filed July 2, 2013, as Case No. CV2013-166, named DPE and other entities involved in the stator project as defendants.  DPE was alleged to have been "retained by Entergy and/or Siemens to provide engineering advice as to the ability of the turbine building deck to support the weight of the crane and the stator."  Id. at 340, ¶ 40.  Allen alleged that, in addition, DPE employees "were also used, at the direction of Entergy's and Siemens' project managers, to aid in other engineering and non-engineering tasks" and that "[t]he tasks for which [DPE] employees were used included, but were not limited to, providing advice and review of the planning and execution of the lift giving rise to [the Allen] action."  Id., ¶¶ 42-43.

    On July 30, 2013, an amended complaint was filed in the Allen lawsuit in which the allegations against DPE were basically

---

[3]Plaintiffs refer to this lawsuit as the "Wade/Walters Lawsuit."  Doc. 36 at 13.

the same as those contained in the original Allen complaint, Doc.
37 at 453-493, except for an added claim for punitive damages
against DPE, id. at 488-89.  A second amended complaint was filed
on August 22, 2014, for the sole purpose of changing the identity
of DPE from "DP Engineering, Inc.," as alleged in the original
and first amended complaints, to "DP Engineering Ltd. Co." Id.
at 557-59.

> 3.  Personal Injury Lawsuits

Two of the personal injury lawsuits were filed by the same
attorneys who filed the Allen lawsuit.  Id. at 492-93, 597, 687-
88.  One of those was brought by Jess Clayton ("Clayton lawsuit")
on September 19, 2013, as Case No. CV2013-269.  Id. at 562.  The
liability allegations against DPE in that complaint appear to be
identical to the liability allegations against DPE in the Allen
complaint.  On November 22, 2013, an amended complaint was filed
in the Clayton lawsuit apparently for the sole purpose of adding
an element of damages.  Id. at 646.  On August 22, 2014, a second
amended complaint was filed, that time for the sole purpose of
making "DP Engineering Ltd. Co." the defendant rather than the
originally named "DP Engineering, Inc." Id. at 650.

The second personal injury lawsuit filed by the same group
of attorneys was Case No. CV2013-323, filed by Ronnie Francis
("Francis lawsuit") on November 22, 2013.  Doc. 37 at 655.  Its

liability allegations mirror those alleged in the Allen and Clayton lawsuits.  On August 22, 2014, an amended complaint was filed in the Francis lawsuit for the purpose of substituting "DP Engineering Ltd. Co." for the originally named "DP Engineering, Inc." as a defendant.  <u>Id.</u> at 739.

The third personal injury lawsuit was filed June 12, 2014, by Christopher Reed and Karen Reed as Case No. CV2014-116 ("Reed lawsuit").  <u>Id.</u> at 744.  It named as defendants DPE and others involved in the stator project.  A comparison of the complaint in the Reed lawsuit against the other personal injury complaints suggests that the liability allegations against DPE in the Reed lawsuit are virtually identical to those in the other personal injury lawsuits.

B.   <u>The Claims Alleged Against DPE and Scroggins in the Underlying Lawsuits</u>

   1.   <u>Entergy Lawsuit</u>

Entergy alleged breach of contract and negligence claims against DPE and a negligence claim against Scroggins.

Entergy's breach of contract claim against DPE were that:

   50.  Effective May 30, 2000, EOI, as agent for EAI, and DP entered into a contract titled, "ENTERGY OPERATIONS, INC. ENGINEER OF CHOICE AGREEEMNT [sic] (PROFESSIONAL GENERAL SERVICES AGREEMENT) AGREEMENT

NO.   10013144 WITH DP ENGINEERING, LTD.," which states, in pertinent part:

> 10.1. The Contractor shall maintain the status of an independent contractor with the sole authority to control and direct the performance of the details of the Work being rendered by its employees and with responsibility for determining the safety of its employees performing Work and with Entergy Operations being interested only in the results obtained. . . .

>     \*         \*         \*

> 24.1. The Contractor shall assign qualified and competent personnel to the performance of the Work set forth in each Contract Order, and the Contractor and such personnel shall use their best efforts to perform the Work described in the Contract Order in the most expeditious, professional and economical manner consistent with the interests of Entergy Operations.

> 24.2. The Contractor warrants that it will perform the Work provided for in this Agreement in conformance with the highest standards of care and practice appropriate to the nature of the Work rendered and exercise the highest degree of thoroughness, competence and care that is customary in the nuclear utility industry. . . .

>     \*         \*         \*

> 31.2. The Contractor shall, by immediate verbal contact, advise the Contract Manager of any existing or potential problem or deficiency that is discovered by or otherwise becomes known to the Contractor whether or not such problem or deficiency is related to work performed by the Contractor or by others, and regardless of when the Contractor becomes aware of the problem or deficiency.

A timely written confirmation shall also be sent to the Contract Manager at the address shown in the Contract Order.

38.1. Contractor shall not undertake performance of any Work until the Work can be done safely. **Contractor shall at all times conduct all Work under this Agreement in a manner to avoid the risk of bodily harm or property damage. Contractor shall make safety its top priority and promptly take all precautions which are necessary and adequate to guard against any conditions which involve a risk of bodily harm or property damage.**

(Ex. A, emphasis added.)

51. Pursuant to the DP Contract, DP, by and through Scroggins, engaged in discussions with Bigge regarding the load testing issue and was involved in the review and revision of drafts of the Bigge/Frederiksen letter.

52. DP breached its contract with EOI in the following respects:

(a) DP failed to provide qualified and competent personnel;

(b) DP, by and through its agent and employee, Scroggins, was directly involved in discussions regarding the decision not to perform a load test and the development of the Bigge/Frederiksen letter;

(c) DP, by and through its agent and employee, Scroggins, was aware of or should have been aware of discrepancies, defects, and deficiencies in the Bigge/Frederiksen letter and its non-compliance with EN-MA-119 yet failed to report them to direct EOI personnel;

21

    (d)   DP, by and through its agent and employee, Scroggins, was aware of or should have been aware of concerns related to the failure to erect the Gantry with sufficient bracing either through attachment to the turbine building or otherwise, but they failed to communicate these concerns to EAI or EOI.

    53.  As a direct and proximate result of DP's breaches, EAI and EOI suffered the above-described damages.

Doc. 37 at 145-147, ¶¶ 50-53.[4]

The negligence cause of action Entergy alleged against DPE were that:

    55.  The actions and inactions of DP described above further constitute negligence by misfeasance. DP had a duty to EOI and EAI to perform its services with the degree of care required by the circumstances, but DP breached that duty through misfeasance in the performance of those duties. As a direct and proximate result of DP's negligence, EOI and EAI suffered the damages described above.

Id. at 147, ¶ 55. And, the negligence cause of action alleged against Scroggins were that:

    57.  Scroggins was the agent and employee of DP who was directly involved and perpetrated the acts and omissions constituting the same negligence asserted against DP. Scroggins individually and independently held duties to plaintiffs to exercise care in performing his functions. Furthermore, Scroggins had the duty to act in the best interests of plaintiffs, and because of his superior knowledge and skill, he was

---

[4]The "EOI" in the allegations refers to Entergy, the "EAI" refers to Energy Arkansas, Inc., and the "DP" refers to DPE Engineering.

> obligated to disclose to plaintiffs the defects and
> deficiencies of which he was aware.  Scroggins breached
> all of these duties and is therefore individually
> liable to plaintiffs for the damages described above
> resulting from his negligence[.]

Doc. 37, ¶ 57.

The claims alleged against DPE and Scroggins by Entergy in its February 4, 2015 amended complaint mirror those alleged in the original complaint.

2.   Allen Lawsuit

The Allen complaint contains numerous allegations of things that "Defendants" did or failed to do, without specifying which of the several defendants named in the complaint are intended to be the subjects of the allegations.  E.g., id. at 344-347, ¶¶ 90-103, 105-107.  The theories of recovery the court can identify as being alleged against DPE were as follows:

> Bigge, Siemens, DP Engineering, & Entergy

> 110. The Defendants, individually, were ordinarily
> negligent when each failed to possess and apply with
> reasonable care the degree of skill and learning
> ordinarily possessed and used by members of its
> profession in good standing, doing work similar to that
> which is described in this Complaint.

> 111. Specifically, the ordinary negligence of the
> Defendants includes, but is not limited to, the
> following:

> > a.   Choosing not to allot enough time to
> > accomplish the task of safely lifting
> > and moving the Main Turbine Generator
> > Stator;

23

b.   Choosing to ignore the warning signs of an unstable crane and proceeding with lifting the Main Turbine Generator Stator;

c.   Choosing to provide and/or use a crane that did not meet the standards necessary to safely lift and move the Main Turbine Generator Stator;

d.   Choosing not to add the proper bracing for the crane used to move the Main Turbine Generator Stator;

e.   Choosing not to use sufficient and proper welds to assemble the crane used to move the Main Turbine Generator Stator;

f.   Choosing not to ensure the crane was properly assembled;

g.   Choosing not to ensure the lift plan for the stator removal was safely and properly executed;

h.   Choosing not to provide and/or follow a safe and effective plan for the removal of the stator in question;

i.   Choosing to omit steps and safety checks necessary for the safe removal of the stator;

j.   Choosing not to require and/or complete a test lift prior to the attempted lift and removal of the stator;

k.   Choosing not to inspect the load bearing welds before the lift was attempted;

l.   Choosing not to properly assess and require the appropriate equipment for the safe removal of the stator;

24

m. Choosing not to have policies and
procedures in place and/or choosing not
to follow policies and procedures that
ensure a safe working environment;

n. Choosing not to have adequate and safe
policies and procedures in place and/or
choosing not to follow adequate and safe
policies and procedures regarding how to
determine who is hired to plan, execute,
and provide equipment for large moves
such as the one giving rise to this
action;

o. Choosing not to have adequate and safe
policies and procedures in place and/or
choosing not to follow adequate and safe
policies and procedures for checking the
competence and safety record of
contractors hired to work on tasks such
as the one giving rise to this action;

p. Choosing not to have adequate and safe
policies and procedures in place and/or
choosing not to follow adequate and safe
policies and procedures regarding the
supervision of contractors it hires;

q. Choosing not to perform its due
diligence and retain safe and competent
independent and/or subcontractors to
perform the lift operations that gives
rise to this action.

Doc. 37 at 347-49, ¶ 110.

### c. Negligence of DP Engineering

120. DP Engineering had a duty to have adequate
policies and procedures in place to ensure it hires
trained, qualified, and competent engineers, employees,
staff, agents, and contractors to carry out the
services it offers.

121. DP Engineering failed in its duty, and was negligent when it chose not to have in place and/or chose not to follow proper policies and procedures, resulting in the hiring of engineers, employees, staff, agents and/or contractors that were not qualified and competent to perform the duties they were assigned by DP and/or Biggie and/or Entergy.

Doc. 37 at 351, ¶¶ 120-21.

### c. Negligence of DP Engineering

133. DP Engineering had a duty to have adequate policies and procedures in place to ensure it properly and sufficiently trained its engineers, employees, staff, agents, and contractors to carry out the tasks assigned to them by DP Engineering.

134. DP Engineering failed in its duty, and was negligent when it chose not to have in place and/or chose not to follow proper policies and procedures, resulting in the inadequate training of engineers, employees, staff, agents and/or contractors to perform the duties they were assigned by DP Engineering and/or Biggie and/or Entergy.

Id. at 353, ¶¶ 133-34.

### c. Negligence of DP Engineering

146. DP Engineering had a duty to have adequate policies and procedures in place to ensure it properly and sufficiently supervised its engineers, employees, staff, agents, and contractors in carrying out the tasks assigned to them by DP Engineering and/or Biggie and/or Entergy.

147. DP Engineering failed in its duty, and was negligent when it chose not to have in place and/or chose not to follow proper policies and procedures, resulting in the inadequate supervision of engineers, employees, staff, agents and/or contractors in

26

performing the duties they were assigned by DP
Engineering.

Doc. 37 at 354-55, ¶¶ 146-47.

### c. Negligence of DP Engineering

160. DP Engineering had a duty to have adequate
policies and procedures in place to ensure it properly
and sufficiently retained qualified and competent
engineers, employees, staff, agents, and contractors in
carrying out the tasks assigned to them by Siemens.

161. DP Engineering failed in its duty, and was
negligent when it chose not to have in place and/or
chose not to follow proper policies and procedures,
resulting in the retention of unqualified and/or
incompetent engineers, employees, staff, agents and/or
contractors in performing the duties they were assigned
by DP Engineering and/or Biggie and/or Entergy.

Id. at 357, ¶¶ 160-161.

The only claim added by either of the Allen amended

complaints was the claim for punitive damages that was added by

the July 30, 2013 amended complaint.

### 3.   Personal Injury Lawsuits

As previously noted, the claims alleged in the personal

injury lawsuits against DPE are not significantly different than

the claims alleged against DPE in the Allen lawsuit, as described

above.

IV.

Analysis

A.   Plaintiffs' Summary Judgment Burdens

As insurers relying on exclusions from coverage contained in the insurance policies, plaintiffs bear the burden to prove the facts that cause the exclusions to be applicable.  National Union Fire Ins. v. Puget Plastics Corp., 532 F.3d 398, 404 (5th Cir. 2008).  Thus, plaintiffs have the summary judgment burden to show that there is no genuine dispute as to any material fact pertinent to their professional services exclusions theory and that they are entitled to judgment as a matter of law based on that theory.  Fed. R. Civ. P. Rule 56(a).

B.   The Summary Judgment Record Establishes that the Professional Services Exclusions Apply to All Claims Alleged Against DPE and Scroggins in the Underlying Lawsuits

The allegations of the complaints in the underlying lawsuits clearly establish that all claims made in those lawsuits against DPE or Scroggins are claims arising out of the rendering of, or failure to render, professional engineering services by DPE.  The various characterizations of the claims in the underlying complaints do not change the true character of the claims -- claims that arose from the rendering, or the failure to render, by DPE of professional engineering services in relation to the stator project.  See American States Ins. Co. v. Bailey, 133 F.3d

28

363, 372 (5th Cir. 1998)(holding that artful pleading suggesting that an insured's "acts were negligent or reckless cannot overcome the basic facts underlying [the] claims"); see also Adamo v. State Farm Lloyds Co., 853 S.W.2d 673 (Tex. App.-- Houston [14th Dist.] 1993, writ denied)(holding that "[i]t is not the cause of action alleged which determines coverage but the facts giving rise to the alleged actionable conduct.")

There is no suggestion in the factual allegations of any of the complaints that any claim is being made against DPE or Scroggins based on menial services, or the services of a common laborer. Rather, all factual allegations disclose that the complaints are related to the professional engineering services DPE undertook to perform in the accomplishment of the stator project. The conclusion to be drawn from the facts alleged in the complaints is inescapable that the plaintiffs are complaining that DPE had specialized engineering knowledge and training that it failed to use, or misused, in such a way that its conduct was a factor in the failure of the gantry. There is no rational reading of any of the state lawsuit complaints other than that each theory of recovery alleged bears an incidental relationship to professional engineering services of DPE. But for those services, there would be no occasion for any of the plaintiffs in

the underlying lawsuits to be making a claim against DPE or
Scroggins.

Even if the professional services exclusions had used the
"due to" rather than "arising out of" language, the court would
be persuaded that the exclusions apply to all claims alleged
against DPE or Scroggins in the underlying lawsuits.  But, the
use of the "arising out of" language strengthens plaintiffs'
justification for denying insurance coverage based on the
exclusions.

Texas law seems to be quite clear that the "arising out of"
language in exclusions such as those before the court causes the
exclusions to have a broader sweep than the "due to" language,
and that when an exclusion prevents coverage from injuries
"arising out of" certain conduct, the claim need only bear an
incidental relationship to that conduct for the exclusion to
apply.  See American States Ins. Co. v. Bailey, 133 F.3d at 370;
see also Sport Supply Grp., Inc. v. Columbia Cas. Co., 335 F.3d
453, 458 (5th Cir. 2003); Scottsdale Ins. Co. v. Texas Sec.
Concepts, 173 F.3d 941, 943 (5th Cir. 1999); Utica Nat'l Ins. Co.
of Tex., 141 F.3d at 203.

An interesting example of the broad effect given to the
"arising out of" exclusionary language is found in the opinion of
the Southern District of Texas in National Fire Insurance Co. of

<u>Hartford v. Radiology Associates</u>, 694 F. Supp. 2d 658 (S.D. Tex. 2010), and the unpublished opinion of the Fifth Circuit reversing in part the rulings of the district court, which is published as <u>National Fire Insurance Co. of Hartford v. Radiology Associates</u>, 439 F. App'x 293 (2011).  In that case, three insurance policies were involved in a declaratory judgment action to determine whether the insurers had defense and indemnity obligations as to a lawsuit brought against the insured, Radiology Associates, based on what was alleged to have been an unauthorized physical examination. 694 F. Supp. 2d at 660-61, 662.

One of the insurance policies had an exclusion that said that it did not apply to bodily injuries "arising out of" medical or diagnostic testing, techniques, or procedures, etc.  <u>Id.</u> at 662.  With respect to that exclusion, the district court noted that "Texas law provides that when an exclusion prevents coverage from injuries 'arising out of' particular conduct, a claim need only bear an incidental relationship to the described conduct for the exclusion to apply."  <u>Id.</u> at 662 (brackets omitted).  The district court held that the claim related to the procedure about which the plaintiff in the underlying lawsuit was complaining was outside the coverage under that policy, and the court granted summary judgment that the insurance company had no duty to defend

31

or indemnify the insured in the state court lawsuit.  _Id._ at 663, 665.

The policy of the second of the three insurance companies had a similar exclusion, using the "arising out of" language. _Id._ at 665.  The district court again granted summary judgment, ruling that the insurance company that issued that policy had no duty to defend or indemnify the insured against claims asserted in the state court lawsuit.  _Id._ at 666.

However, the district court ruled against the third insurance company, American Physicians Insurance Company ("API"), and in favor of Radiology Associates as to the third insurance policy on the ground that there was uncertainty as to whether the unauthorized physical examination constituted a "sexual act" or an "intentional tort" within the meaning of two exclusions in the third policy.  _Id._ at 667.  The district court denied API's motion for summary judgment seeking a declaration that it had no duty to defend or indemnify its insured, and granted the insured's motion for partial summary judgment that it was entitled to a defense under the API policy.  _Id._ at 668.

API appealed from the district court's ruling against it, and the Fifth Circuit reversed, holding as a matter of law that the two exclusions in the API policy prevented API from having any defense or indemnity obligation as to the suit against

32

Radiology Associates.  National Fire Insurance Co. of Hartford,
439 F. App'x at 297.  The Fifth Circuit reached that result
notwithstanding allegations in the complaint that Radiology
Associates was negligent, holding that "[e]ven though the . . .
complaint alleges Radiology Associates was negligent, those
claims all arise out of [its employee's] excluded conduct,
therefore falling outside the policy coverage and relieving
American Physicians of its duty to defend."  Id.

     The Fifth Circuit's decision in National Fire Insurance Co.
of Hartford appears to have turned on two principles that are
pertinent to this court's rulings in the instant action.  First,
each of the exclusions in the API policy used the "arises out of"
language.  Id. at 294.  The Fifth Circuit gave special effect to
that language, saying that such an exclusion, under Texas law,
prevents coverage for injuries that bear an incidental
relationship to the described conduct for the exclusion to apply.
Id. at 296.  And, second, the Court was not influenced by the
allegations in the underlying lawsuit that the conduct in
question resulted from the negligent failure of Radiology
Associates to do certain things--the failure to provide a
chaperone for the patient, failure to post notices, failure to
inform patients of the right to a chaperone, and failure to
monitor its employees properly.  As to those negligence claims,

the Fifth Circuit said "[t]hese claims 'arise out of' [the
employee's] unauthorized . . . conduct" and that "[b]ut for [the
employee's] improper conduct, [the state court plaintiff] would
have no claims against Radiology Associates." Id.

When the principles that influenced the Fifth Circuit's
decision in National Fire Insurance Co. of Hartford are applied
here, the conclusion must be reached that the various claims of
negligence against DPE and Scroggins all arose out of
professional engineering services provided by DPE, and that but
for those services, there would be no claim against DPE or
Scroggins in the underlying lawsuits.

When, as here, an exclusion is shown to be applicable, this
court has "jurisdiction to rule on the duty to indemnify despite
the fact that the underlying state court suit[s] [have] not yet
reached final judgment." American States Ins. Co., 133 F.3d at
368. In American States Ins. Co., the Fifth Circuit added that:
"[g]iven that the district court was going to decide the issue of
the duty to defend . . . , it was not an abuse of discretion for
the district court also to decide the issue of the duty to
indemnify." Id. at 368-69. To the same effect is the holding of
the Texas Supreme Court in Farmers Texas County Mutual Insurance
Co. v. Griffin, 955 S.W.2d 81, 84 (Tex. 1997)(holding that "the
duty to indemnify is justiciable before the insured's liability

is determined in the liability lawsuit when the insurer has no duty to defend <u>and the same reasons that negate the duty to defend likewise negate any possibility the insurer will ever have a duty to indemnify</u>").

As discussed below, the court has concluded that plaintiffs have no duty to defend DPE or Scroggins in any of the underlying lawsuits. Therefore, the court is ruling that none of the insurance policies in question causes either plaintiff to have any obligation to provide indemnification to DPE or Scroggins as to any of the claims asserted in any of the underlying lawsuits.

Nor do any of the insurance policies cause either plaintiff to have any obligation to provide a defense to DPE or Scroggins as to any of the claims asserted in any of the underlying lawsuits. "If a petition does not allege facts within the scope of coverage, an insurer is not legally required to defend a suit against the insured." <u>National Union Fire Ins. Co. v. Merchants Fast Motor Lines, Inc.</u>, 939 S.W.2d 139, 141 (Tex. 1997). <u>See also</u> <u>Trinity Universal Ins. Co. v. Cowan</u>, 945 S.W.2d 819, 821 (Tex. 1997). The court is satisfied from the summary judgment evidence that the exclusionary language is broad enough that none of the allegations in any of the underlying lawsuits states facts that would invoke coverage under any of the three insurance policies at issue. Due to the professional services exclusions

35

the allegations of the complaints, when considered as a whole, do not allege a claim that is even potentially within the coverage of any of the three insurance policies. Therefore, the court is ruling that neither of the plaintiffs has any duty under any of the three policies in question to provide a defense to DPE or Scroggins as to any of the claims being asserted against them in any of the underlying lawsuits.[5]

Summed up, plaintiffs have satisfied their burden to prove the facts that cause the professional services exclusions in the three policies to be applicable, and have shown that there is no genuine dispute as to any material fact pertinent to their professional services exclusions theory of non-coverage and that they are entitled to judgment as a matter of law based on that theory. Plaintiffs are entitled to summary declarations that they have no indemnity or defense obligations as to any of the claims asserted against DPE or Scroggins in the underlying lawsuits.[6]

---

[5]DPE and Scroggins have not challenged the note by plaintiffs in their supporting brief that DPE and Scroggins are being defended in the underlying lawsuits by U.S. Specialty Insurance Company under a professional liability policy. Doc. 36 at 1 n.3.

[6]In deciding to grant the declaratory judgment relief sought by plaintiffs, the court has considered the relevant factors mentioned in <u>Travelers Insurance Co. v. Louisiana Farm Bureau Federation, Inc.</u>, 996 F.2d 774, 778 (5th Cir. 1993), and is satisfied that the decision of the court to grant the declaratory relief requested is supported by those factors. There is no pending state court action in which the matters in controversy between plaintiffs, on the one hand, and DPE and Scroggins, on the other, may be fully litigated; nothing has been brought to the court's attention to cause the court to think that plaintiffs filed

(continued...)

V.

Order

Consistent with the foregoing,

The court ORDERS that the relief sought by plaintiffs by their motion for summary judgment be, and is hereby, granted;

The court further ORDERS and DECLARES that neither plaintiff has any obligation under any of the insurance policies in question to indemnify DPE as to any of the claims asserted against it in any of the underlying lawsuits;

The court further ORDERS and DECLARES that neither plaintiff has any obligation under any of the insurance policies in question to indemnify Scroggins as to any of the claims asserted against him in any of the underlying lawsuits;

The court further ORDERS and DECLARES that neither plaintiff has any obligation under any of the insurance policies in question to provide a defense to DPE to any of the claims asserted against it in any of the underlying lawsuits; and

The court further ORDERS and DECLARES that neither plaintiff has any obligation under any of the insurance policies in

---

[6](...continued)
this action in anticipation of a lawsuit filed by DPE and Scroggins; there is no reason to think that plaintiffs engaged in forum shopping in bringing the suit; the court is unaware of the existence of any inequities in allowing plaintiffs to gain precedence in time or in plaintiffs' forum selection; this court is a convenient forum for all parties; and, the resolution of the claims asserted in this lawsuit in federal court would serve the purposes of judicial economy.

question to provide a defense to Scroggins to any of the claims
asserted against him in any of the underlying lawsuits.

     SIGNED April 24, 2015.

                  JOHN McBRYDE
                  United States District Judge